**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Calvin GRIFFIN, Defendant-Appellant.**

**No. 75–1543.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 1, 1975.

Decided Feb. 20, 1976.

William T. Huyck, Chicago, Ill., for defendant-appellant.

Samuel K. Skinner, U. S. Atty., William R. Coulson, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CASTLE, Senior Circuit Judge, SPRECHER, Circuit Judge, and CAMPBELL, Senior District Judge.*

CASTLE, Senior Circuit Judge.

Calvin Griffin, Robert Russell, and Larry Carr were charged in a one-count indictment with knowingly possessing mail which had been stolen, taken, or abstracted from and out of the mail in

---

* The Honorable William J. Campbell, Senior District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

violation of 18 U.S.C. § 1708.[1] The three men waived their right to a trial by jury and were tried separately. Russell and Griffin were found guilty and Carr was acquitted. Only Griffin appeals.

Griffin contends on appeal that his conviction rests on evidence that was unlawfully seized from an apartment which he occupied at the time of his arrest. The district court denied appellant's motion to suppress, holding that the items were validly seized pursuant to a consent search. We affirm the judgment of the district court.

## I.

Acting pursuant to information given by an anonymous telephone caller, several Chicago police officers arrived at an apartment on the west side of Chicago in the early afternoon of June 12, 1974. The anonymous caller had informed the police that three men who he knew not to be postal employees had entered the apartment house with a mailbag. The caller also described the automobile in which the three men had arrived.

Arriving at the scene, the police officers observed the automobile which the caller had described. Two officers entered the building and knocked on the door of the apartment. They heard "shuffling" sounds emanating from behind the door, and moments later Robert Russell opened the door. The officers related the contents of the telephone call to Russell and asked if he knew anything about the men with the mailbag. Russell replied that he did not, and in response to the officers' request to be admitted into the apartment, Russell said he was entertaining a woman and "slammed" the door in their faces.

The officers remained in the hallway outside the apartment and were thereafter informed that other officers observing the rear of the building had apprehended one of two men who jumped

from a window of the apartment. This man, Larry Carr, was brought in handcuffs to the officers waiting in the hallway. Asked why he had fled the apartment, Carr replied that he had been smoking marijuana. Contemporaneously with this, a young woman was observed fleeing from the apartment through the back door.

With these new facts in hand, the officers again knocked on the door of the apartment and again it was opened by Russell. The officers informed Russell of the flight of the two men from the apartment and asked if he lived in the apartment. The officers also asked for identification. Russell was unable to produce any identification and responded that the apartment was that of a friend. The officers told Russell that they had reason to believe a burglary was in progress inside the apartment, and again asked to be admitted. Russell stepped back into the apartment, leaving the door partially open. Neither officer later recalled any words spoken by Russell during these moments. The officers entered the apartment and followed Russell down a short hallway into the living room. There they observed Griffin seated in a chair. They also saw unopened mail strewn about a table and protruding from beneath a closet door left ajar in the room. They examined the addresses on the mail. Griffin was asked to stand and when he did the officers noticed a shoulder strap protruding from the chair. Believing it to be part of a firearm holster, an officer pulled on the strap and discovered that it was part of a mailbag. Soon thereafter, the officers received an official report of a stolen mailbag. Russell and Griffin were promptly taken into custody.

Before trial, the appellant sought suppression of the mail recovered in the apartment on grounds that the officers

---

1. That section provides in pertinent part:

   Whoever . . . unlawfully has in his possession, any letter, postal card, package, bag, or mail, or any article or thing contained therein, which has been so stolen, taken, embezzled, or abstracted, as herein described, knowing the same to have been stolen, taken, embezzled, or abstracted—

   Shall be fined not more than $2,000 or imprisoned not more than five years, or both.

   18 U.S.C. § 1708.

had unlawfully entered the premises.[2] He also maintained that even if Russell had consented to the officers' entry into the apartment, the mail was nevertheless unlawfully seized because the officers exceeded the scope of any consent given by Russell.

The district court found that Russell consented by conduct to the officers' entry into the apartment and that once lawfully inside the mail could be seized since it was in "plain view." The court was of the opinion that a consideration of all the facts led to the inescapable conclusion that Russell had consented to the officers' entry even though he did not express that consent orally. In this appeal, Griffin renews his attacks on the search and seizure of the mail which he first advanced before trial in his motion to suppress.

## II.

■ It is well settled that a person may waive his or her fourth amendment rights by consenting to a search. *Davis v. United States*, 328 U.S. 582, 593–94, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946); *Bumper v. North Carolina*, 391 U.S. 543, 548–49, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). The consent may be in the form of words, gesture, or conduct. *Robbins v. MacKenzie*, 364 F.2d 45, 48–49 (1st Cir. 1966), *cert. denied*, 385 U.S. 913, 87 S.Ct. 215, 17 L.Ed.2d 140 (1966). The consent, however, must be voluntary, *i. e.* freely and intelligently given. *Bumper v. North Carolina, supra*, 391 U.S. at 548, 88 S.Ct. 1788; see also *Gorman v. United States*, 380 F.2d 158, 163 (1st Cir. 1967). See generally J. Waltz, Criminal Evidence 199–202 (1975).

■ The existence and voluntariness of a consent is a question of fact. *Maxwell v. Stephens*, 348 F.2d 325, 336 (8th Cir. 1964), *cert. denied*, 382 U.S. 944, 86 S.Ct. 387, 15 L.Ed.2d 353 (1965). Therefore, only where the district court's find-

ing of a voluntary consent is clearly erroneous may a reviewing court set it aside. *Id.*

In *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the Supreme Court stated that in testing the voluntariness of a consent, the "totality of the circumstances" must be considered. The Court noted that neither the presence nor the absence of any single criteria can be controlling in the determination. *Id.* at 226, 93 S.Ct. 2041. Rather, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced." *Id.* at 233, 93 S.Ct. at 2050.

■ In considering the "totality of the circumstances" surrounding the consent in this case, we must be mindful of various factors which other courts have deemed important in determining voluntariness. A consent obtained through the use of coercion, whether actual or implicit, is inherently involuntary. The form of coercion, whether it be physical or psychological, is of no consequence. Subtle coercion, in the form of an assertion of authority or color of office by the law enforcement officers may make what appears to be a voluntary act an involuntary one. See, e. g., *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); *United States v. Nicholas*, 448 F.2d 622 (8th Cir. 1971). Likewise, the obtaining of consent from a person in custody is inherently suspect. *United States v. Jones*, 475 F.2d 723 (5th Cir. 1973), *cert. denied*, 414 U.S. 841, 94 S.Ct. 96, 38 L.Ed.2d 77 (1974). However, neither the mere fact of arrest nor the person's knowledge that a search "will almost certainly demonstrate his guilt" preclude the finding of a voluntary consent. *United States ex rel. Lundergan v. McMann*, 417 F.2d 519, 521 (2d Cir. 1969); *United States v. Kohn*, 365

---

**2.** Appellant Griffin has standing to question the district court's finding of a voluntary consent on the part of Russell since the search was also directed at him and he was charged with possessing the material seized in the search. See *Brown v. United States*, 411 U.S. 223, 229, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973);

*United States v. Blok*, 88 U.S.App.D.C. 326, 188 F.2d 1019, 1021 (1951); *United States v. Hearn*, 496 F.2d 236 (6th Cir. 1974), *cert. denied*, 419 U.S. 1048, 95 S.Ct. 622, 42 L.Ed.2d 642 (1974); *United States v. Poole*, 307 F.Supp. 1185, 1189–90 (E.D.La.1969).

F.Supp. 1031, 1034 (S.D.N.Y.1973), *aff'd*, 495 F.2d 763 (2d Cir. 1974). Trickery, fraud, or misrepresentation on the part of the police to gain entry naturally undermines the voluntariness of any consent. All of these considerations emphasize the fact that in determining the voluntariness of a consent, the "psychological atmosphere" in which it is obtained is of critical importance. See *United States v. Rothman*, 492 F.2d 1260, 1265 (9th Cir. 1973).

### III.

We must first determine whether Russell's actions could reasonably be interpreted to manifest consent to the officers' entry into the apartment. Once the existence of a consent by conduct is determined, its voluntariness must be examined.

■ Russell's actions leading to the officers' entry must be placed in perspective and viewed in relation to the "totality of the circumstances" surrounding his confrontation with the officers. A few minutes prior to the officers' entry into the apartment, Russell had responded "no" to a similar request to enter the apartment and shut the door in the officers' faces. This occurrence clearly indicates that Russell was both aware of his right to refuse entry under the circumstances and unintimidated by the officers' color of authority. His subsequent actions supporting the district court's finding of consent must be viewed in light of this prior confrontation. The second time the officers requested entry, Russell did not say "no," nor did he shut the door. Instead of repeating his earlier response, Russell stepped back, leaving the door open, and led the officers into the apartment. Comparing this to the earlier response of Russell, we believe it was reasonable for the district court to find that by leaving the door open and stepping back, Russell invited the officers into the apartment and thereby consented to their entry.[3] Compare *Robbins v. MacKenzie, supra*, at 48–50.

■ We are of the opinion that Russell's consent was clearly voluntary. Keeping in mind the "psychological atmosphere" surrounding the series of events leading up to Russell's allowing the officers to enter, we have reviewed the record thoroughly and have found no coercion—actual, implicit, subtle, or otherwise—that vitiates the facial voluntariness of his actions. While the officers were in uniform, this alone cannot support a conclusion that Russell submitted to the color of their authority. In addition, at no time did the officers threaten Russell or brandish their weapons.

Most importantly, however, is the clear absence of any misrepresentation, deception, or trickery on the part of the police. On both occasions when the police requested entry, the officers fully informed Russell of the events leading to their presence and the reasons for their request to be admitted into the apartment. In fact, the officers disclosed to Russell virtually all of the information they had in their possession concerning their interest in the apartment. When Russell allowed the police to enter, he was fully aware that they were investigating a report that a stolen mailbag had been brought into the apartment. Thus, this case is significantly different from the situation in *Johnson v. United States, supra*, upon which appellant heavily relies. In *Johnson* the police gained entry into an apartment by virtue of the announcement of their authority.[4] Only after the officers had gained

---

**3.** The events immediately following the officers' entry also support this conclusion. Once the officers stepped inside the door, Russell turned and walked into the living room of the apartment leading the officers who were following close behind. At no time did Russell or any other person in the apartment object in any way to the officers' presence inside the apartment.

**4.** See *Johnson v. United States, supra*, 333 U.S. at 12, 68 S.Ct. at 368:

[The officers] knocked and a voice inside asked who was there. "Lieutenant Belland," was the reply. There was a slight delay, some "shuffling or noise" in the room and then the defendant opened the door. The officer said, "I want to talk to you a little bit." She then . . . "stepped back acquiescently and admitted us."

admittance into the premises did they disclose the reason for their request to be admitted. Here, however, the police made it clear why they sought admittance before Russell allowed them to enter. No deception on the part of the police occurred. In light of this full disclosure by the police and the absence of any signs of coercion by the officers, we hold that the district court did not err in finding that Russell voluntarily consented to the officers' entry into the apartment.

Appellant's second argument is that even if Russell voluntarily consented to the officers' entry, that consent was limited to entry to question the occupants of the apartment and to determine whether a burglary was in progress inside. The officers had no authority, appellant maintains, to search for evidence under the scope of the consent given by Russell. Therefore, he contends that the search and seizure of the mail in the apartment was unlawful.

It is clear that a person may limit the consent which he gives to authorities to search his premises. *United States v. Dichiarinte*, 445 F.2d 126, 129 (7th Cir. 1971). And "a consent search is reasonable only if kept within the bounds of the actual consent." *Id.*, citing *Honig v. United States*, 208 F.2d 916, 919 (8th Cir. 1953). However, here the record clearly indicates that the mail seized by the officers was in "plain view." Therefore, even if Russell limited his consent in the manner in which appellant contends, once lawfully inside the apartment, the officers could lawfully seize evidence that was in their "plain view." *Ker v. California*, 374 U.S. 23, 42–43, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); *United States v. Pointer*, 348 F.Supp. 600, 604 (W.D.Mo.1972); *People v. Plane*, 274 Cal.App.2d 1, 78 Cal.Rptr. 528 (1969).

Nor may appellant argue that the "plain view" doctrine cannot support the seizure of the mail since its evidentiary nature was not apparent without picking it up and closely examining it. In light of the fact that the officers were present on the scene in relation to

a report of a stolen mailbag, it was reasonable for them to inspect and seize the mail as evidence. No "general search" was conducted by the officers. Compare *United States v. Rothman, supra,* at 1265–66.

We accordingly affirm the judgment of the district court.

Affirmed.